UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

PYROLYX USA INDIANA, LLC;                        Case No. 2:20-cv-00108-JMS-DLP
PYROLYX USA INC.;
PYROLYX AG

            Plaintiffs,

   v.


ZEPPELIN SYSTEMS GmbH;
ZEPPELIN SYSTEMS USA, INC.

         Defendants.


## **AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(1)(B) and the Court's March 31, 2020 Order [21], Plaintiffs, Pyrolyx USA Indiana, LLC ("Pyrolyx Indiana"); Pyrolyx USA Inc. ("Pyrolyx USA") and Pyrolyx AG ("Pyrolyx Parent") (collectively, "Pyrolyx"), file the following Amended Complaint:

## **INTRODUCTION**

1.     Pyrolyx has developed an innovative, environmentally sustainable process to break down used tires into raw materials that can be re-used for other products.

2.     In or around 2016, Pyrolyx began considering an expansion of its business by constructing a new recovered carbon black facility in Terre Haute, Indiana (the "Project"), which would create jobs and commerce locally.

3.     A German company called Zeppelin Systems GmbH ("Zeppelin Germany"), owns, operates and exercises complete dominion over Defendant Zeppelin Systems USA, Inc. ("Zeppelin USA") (collectively "Zeppelin") - which is a Florida company.

4.      Zeppelin Germany conducted front-end engineering and design for the Project and repeatedly represented to Pyrolyx, its advisors and its investors that it and Zeppelin USA (which it collectively referred to as the Zeppelin Group) had the resources, manpower and experience to design and construct the Project in a timely and efficient manner and coordinate the Project as a whole, all for a fixed-price.

5.      Zeppelin was well aware that Pyrolyx would not have moved forward with the Project and obtained financing unless Zeppelin convinced it that the Zeppelin Group had the resources, manpower and experience to design and construct the Project on time and coordinate the Project as whole, all for a fixed-price.

6.      Zeppelin met with Pyrolyx and a number of Pyrolyx's actual and potential investors, including its underwriting investment bank, where it represented that the Zeppelin Group had the necessary expertise to design and construct the project and coordinate the Project as a whole by serving as the Project Management Consultant ("PMC"), all for a fixed-price. Zeppelin represented that the Zeppelin Group's global resources would allow it to complete the Project on time and on budget.  Based on these representations, Pyrolyx decided to proceed with the Project and raise the necessary capital.

7.      As such, Pyrolyx Indiana entered into a fixed price contract with Zeppelin USA for construction of the Project (a copy of which is attached hereto as Exhibit 1).  Zeppelin USA agreed to engineer, procure equipment, install equipment, commission the entire Project and "coordinate the project as a whole," all for a fixed price.

8.      Zeppelin even issued a press release where it publicly touted its abilities, capabilities and that it would be "planning the entire plant and acting as general contractor" for what it called the "world's largest tire recycling plant."

9.      Unbeknownst to Pyrolyx, Zeppelin had misrepresented its intentions and capabilities to Pyrolyx, as well as to Pyrolyx's advisors and investors who would supply the necessary capital for the Project.  Among other things, Zeppelin lacked the capability and experience to coordinate the Project as a whole or to construct the Project on time for the fixed price.  Nor did it have any intent of doing so.

10.     Zeppelin had severely understated the cost and complexity of the Project to Pyrolyx and misrepresented its intentions and capabilities to complete the Project on time so that it could convince Pyrolyx to proceed with the Project.

11.     Zeppelin failed to deliver on its promises at every turn.  Zeppelin lacked the resources, capability and experience to coordinate the Project as a whole.  Zeppelin's management was poor and had no ability to manage the work.  The Project schedule was pushed back again and again due to Zeppelin's incompetence and unwillingness to do as it promised.

12.     In an attempt to force Pyrolyx into giving Zeppelin additional compensation and additional time to perform its work (so as to avoid the contract's liquidated damages mandate), Zeppelin repeatedly halted its work on the Project unilaterally - until Pyrolyx would agree to its demanded increased costs and/or extended deadlines.

13.     Zeppelin would also submit improper invoices to Pyrolyx demanding payment for work it had not performed and milestones it had not achieved.   Zeppelin also attempted to obtain additional compensation that it did not deserve from Pyrolyx through the guise of "change orders."

14.     When Pyrolyx pushed back against Zeppelin's improper invoices and continued attempts to increase the fixed price, Zeppelin ultimately abandoned the Project and failed to complete its contractual obligations.  Pyrolyx was left with no choice but to declare Zeppelin in default under their contract and finish the Project itself.

15.    Zeppelin retaliated by filing a mechanics' lien against the Project in breach of its contract and in an attempt to prevent Pyrolyx from being able to proceed with another carbon black facility in Terre Haute that would add even more jobs to the local economy.

16.    Zeppelin's mechanics' lien included amounts for equipment Zeppelin had not provided (such as spare parts) and services Zeppelin had not rendered (such as cold and hot commissioning).

17.    Zeppelin's retaliation efforts also included a campaign to discredit Pyrolyx and threaten its continued existence by, *inter alia*, interfering with Pyrolyx's attempts to finish Zeppelin's work and complete and commission the Project.

18.    Specifically, Zeppelin threatened many contractors that Pyrolyx had a contract or business relationship with, via letters or otherwise to cause them (some of which are not even involved with the Terre Haute Project) to not work with Pyrolyx or provide spare parts or advice.

19.    Zeppelin intentionally engaged in such conduct in an effort to have contractors and vendors stop working for and supplying Pyrolyx with the materials necessary to complete both this Project and another carbon black facility in Terre Haute (the "New Project") as well as materials Pyrolyx needs for its other operations.  Although Pyrolyx has repeatedly demanded that Zeppelin stop such interference, Zeppelin has ignored such demands.

20.    As such, Pyrolyx now seeks to recover the substantial damages it has already incurred and anticipates it will incur as the result of Zeppelin's breaches, intentional acts and omissions. Through this lawsuit, Pyrolyx seeks to recover: (i) the significant compensatory damages it has incurred as a result of Zeppelin's late, defective and incomplete design and construction work; (ii) damages resulting from delays on the Project, including amounts owed pursuant to an agreed-upon liquidated damages provision; (iii) amounts Pyrolyx incurred (and will

incur) to complete the Project; (iv) increased cost to the New Project resulting from Zeppelin's wrongful conduct; and (v) punitive damages as the result of Zeppelin's malicious, willful and fraudulent conduct.

## **PARTIES**

21.     Plaintiff, Pyrolyx USA Indiana, LLC ("Pyrolyx Indiana") is an Indiana limited liability company with its principal place of business located at 4150 East Steelton Avenue, Terre Haute, Indiana 47805.

22.     Pyrolyx Indiana is a wholly owned subsidiary of Plaintiff, Pyrolyx USA, Inc. ("Pyrolyx USA"), a Delaware corporation with its principal place of business in Wilmington, Delaware, which was formed to pursue the Project and operate the completed facility.

23.     Pyrolyx USA is a subsidiary of Pyrolyx AG ("Pyrolyx Parent"), which is a German company with a principal place of business at Landshuter Allee 8-10 80637 München, Germany.

24.     Defendant, Zeppelin Systems USA, Inc. ("Zeppelin USA") is a Florida corporation with its principal place of business located at 13330 Byrd Drive, Odessa Florida  33556.

25.     Zeppelin USA is a wholly owned subsidiary of Defendant Zeppelin Systems GmbH ("Zeppelin Germany"), which is a German company with a principal place of business at Graf-Zeppelin-Platz 1, 88045 Friedrichshafen, Germany.

## **JURISDICTION AND VENUE**

26.     This Court has personal jurisdiction over Zeppelin USA and Zeppelin Germany because they regularly conduct business in Vigo County, Indiana and among other things,

contracted to render services in Vigo County, Indiana and because the facts and circumstances giving rise to this action took place in Vigo County, Indiana.

27.     The Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties to this action are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## FACTS

**A.      Pyrolyx Relies Upon Zeppelin's Representations to Decide to Undertake the Project.**

28.     Pyrolyx has developed a thermal chemical process to break down tire rubber in a sustainable manner into a reinforcing agent known as recovered carbon black.

29.     Carbon black is a gritty black powder that is used as a reinforcing agent mostly in tires (approximately 70% of world-wide carbon black is used in tires) and black plastic.

30.     Zeppelin is a contractor that builds and installs customized mechanical equipment for the carbon black industry, such as silos and other solid handling equipment, around the world.

31.     In the past, Zeppelin Germany partnered with Pyrolyx Parent.  Zeppelin Germany designed and constructed Pyrolyx Parent's pilot plant in the Netherlands in or around 2009.

32.     Zeppelin Germany also performed some engineering optimization studies at another Pyrolyx plant in Stegelitz, Germany in 2015 and 2016.

33.     In or around 2016, Pyrolyx Parent formed Pyrolyx USA and began considering expanding its footprint in the United States by constructing a new carbon black facility in Terre Haute, Indiana that was substantially similar to a carbon black facility in Stegelitz, Germany owned by Pyrolyx Parent but with double the capacity (i.e., have 20 batch pyrolysis ovens instead of eight ovens at Stegelitz).

34.     As a small emerging company, Pyrolyx would have to rely upon Zeppelin for the engineering and construction for the new facility.  Zeppelin was well aware Pyrolyx was relying upon Zeppelin to provide the engineering, construction and PMC services for the Project.

35.     Indeed, over the past several years, Zeppelin had fostered a close relationship of trust with Pyrolyx by allowing Pyrolyx to share Zeppelin's booths at multiple trade fairs. As a result, Zeppelin convinced Pyrolyx (and its actual and potential investors) that the two companies had a strong and long "partnership" relationship and Pyrolyx (and its actual and potential investors) should trust in Zeppelin's capabilities and integrity.  Pyrolyx (and its actual and potential investors) did so and did not even bid out the potential Project to other construction companies.

36.     Indeed, on October 10, 2016, Zeppelin Germany's Guido Veit sent an email to Niels Raeder of Pyrolyx which he entitled:  "COMFORT LETTER Subject:  Zeppelin's support for the erection of the first Pyrolyx reference plant in the United States."

37.     In this email, Mr. Veit represented it was Pyrolyx's "exclusive business partner" and that it had the resources, manpower and experience to design and construct the Project but needed among other things, "a detailed preplanning."

38.     In this so-called "Comfort Letter," Mr. Veit represented that:  "Zeppelin is the exclusive business partner for the development and erection of tire recycling plants for the treatment of waste rubber and tires, and therefore, we are highly interested in accompanying this technology until it is ready for the market and in providing our support for the erection of the first reference plant in the United States.  In order to support this project, we mentioned the possibility at an earlier date that we could be prepared to grant a delay in payment of the final instalment of the plant price until it can be proven the plant is producing in a stable environment and that operation of the plant is profitable."

39.     As such, Pyrolyx Parent hired Zeppelin Germany to complete Front-End Engineering and Design ("FEED") for the Terre Haute facility in late 2016.

40.     Zeppelin Germany convinced Pyrolyx Parent that because it had frequently visited and advised on Pyrolyx's Stegelitz plant it could incorporate its functional knowledge of this plant into its FEED work.

41.     The objective of Zeppelin Germany's FEED scope of work was to determine what it would cost to construct the Terre Haute facility so Pyrolyx could determine whether it would proceed with the Project.

42.     Also as part of its FEED work for the Terre Haute facility, Zeppelin Germany was to provide among other things, a 3D design, PFD diagrams, P&ID diagrams, a block diagram for the plant as a whole, a utility consumption list and a preliminary main equipment list.

43.     Zeppelin Germany was also to provide details and a timeline for constructing the Terre Haute facility in three steps so as to achieve installation and commissioning faster.

44.     In or around late 2016, Zeppelin Germany issued a FEED report to Pyrolyx.

45.     Zeppelin Germany subsequently represented to Pyrolyx that the Zeppelin Group would design and construct the Terre Haute Project for the fixed price of €15,080,000 (Euro).

46.     Zeppelin Germany also represented that the Zeppelin Group had the resources, manpower and experience to design and construct the Project on time and coordinate the Project as whole, all for a fixed-price.

47.     As such, Pyrolyx began the process of raising capital in order to proceed with constructing the Terre Haute facility by way of an IPO in Australia and tax exempt bond funding in the USA.

48.     During this process, Zeppelin Germany repeatedly represented to Pyrolyx, its advisors and its investors that the global Zeppelin Group had the resources, manpower and experience to design and construct the Project on time and provide PMC services to coordinate the Project as whole, all for a fixed-price and meet all time deadlines.

49.     At all times, Pyrolyx was led to believe that the global Zeppelin Group would be working on the Project. Zeppelin represented itself as a global group and Pyrolyx was unaware of the allocations of responsibilities of particular tasks.

50.     Zeppelin representatives, including Zeppelin Germany's Guido Veit and Rochus Hoffman, met with various Pyrolyx representatives and Pyrolyx advisers on multiple occasions and represented that the global Zeppelin Group had the capability to and would complete the Project on time and for the stated fixed price.

51.     On or around September 21, 2016, representatives from Pyrolyx and its ASX IPO underwriting broker, Moelis Australia, including Frank Danieli and Amelia Hill (who later served on the Supervisory Board for Pyrolyx Parent) met with Mr. Veit and Mr. Hoffman as well as other Zeppelin representatives, at Zeppelin Germany's headquarters in Friedrichshafen, Germany.

52.     Zeppelin represented it had the requisite expertise regarding the recovered carbon black manufacturing process because of its engineering work at the Stegelitz plant - which had the same functional design as the Indiana Project - and it could develop the plans for the Indiana Project based on its work at the Stegelitz plant.

53.     In or around February 2017, Mr. Veit had one or more conversations with Pyrolyx's Michael Triguboff where he represented among other things that:

- Zeppelin viewed Pyrolyx paternalistically and as its partner as it had allowed Pyrolyx and its team to jointly market with it at booths in trade fairs for over four years;

- Zeppelin would manage and coordinate the construction and commissioning of the Project;

- Zeppelin had the requisite experience to manage and coordinate the construction and commissioning of the Project because it had helped construct the pilot plant, reviewed the Stegelitz plant and completed the FEED work;

- Zeppelin could design and construct the Project on time and coordinate the Project as a whole, all for a fixed-price with little risk because the Project was substantially similar to the Stegelitz plant, except on a larger scale;

- Zeppelin would apply its analysis and know-how from the Stegelitz plant to the Project; and

- Zeppelin had worldwide resources and were experienced in this area because it had constructed over 80% of the chemical mixing rooms for tire companies globally.

54.    On or around February 23, 2017, in an effort to convince Pyrolyx to proceed with the Project, Mr. Viet provided Pyrolyx's Holger Merz materials regarding the Zeppelin Group's capabilities to complete the Project.

55.    In these materials, Zeppelin represented that it "is the world leading manufacturer of tire recycling plants."  Zeppelin also represented that "we design your entire system so that you achieve maximum efficiency.  As plant engineers, we deliver the plant precisely the way you expect us to:  fast, trouble-fee and with precision interfaces."

56.    In these materials, Zeppelin also marketed Pyrolyx as its partner, representing that: "[t]ogether with our project partner Pyrolyx we build plants for recycling used tires.  We produce high-quality carbon black that meets the most stringent quality requirements."

57.    On or around April 5, 2017, representatives from Pyrolyx and Moelis Australia, including Sarah Mann and Ian McKenzie of Moelis Australia, met with Mr. Veit and Mr. Hoffman as well as other Zeppelin representatives, at Zeppelin Germany's headquarters in Friedrichshafen, Germany.

10

58.    In the meetings, Zeppelin represented that the contract would be a fixed price contract where Zeppelin would assume the obligations to design, construct and coordinate the Project as a whole and that Zeppelin had the resources, manpower, experience and capabilities to do so.

59.    Zeppelin represented that it had the capabilities and ability to achieve commissioning of the Project within the timeframe.

60.    On or around April 13, 2017, Zeppelin representatives, including Mr. Veit, met with representatives from Pyrolyx, Tim Hoover (of investment bank Piper Jaffray) and Al Rettenmaier (of E3 Consulting, Inc. ("E3"), an independent engineering consulting firm hired by Pyrolyx to report on the status of the Project), at Zeppelin Germany's headquarters in Friedrichshafen, Germany.

61.    E3 is a leading business advisor in providing technical due diligence and independent engineering reviews of energy, industrial and public infrastructure projects that has a track record of reviewing facilities for lenders.

62.    At all these meetings, Zeppelin again represented that it had the resources, manpower, experience and capabilities to and that it would design, construct and complete the Project on time and for a fixed price.

63.    Also, around this time, Pyrolyx representatives, including Michael Triguboff, Tom Redd and others had discussions and exchanged emails with Zeppelin representatives, including Mr. Veit, where Zeppelin represented that it had the capability to and that it would design, construct and complete the Project on time in accordance with schedules it developed and for the fixed price.

64.    For instance, on April 13, 2017, Zeppelin Germany's Thomas Schuetze represented

in an email sent to Pyrolyx employees, Steffen Dorigo, Holger Merz and Lorenz Zimmer that Zeppelin had the internal specialists at "Zeppelin India" that would deal with the Project's safety related topics including a Hazard and Operability ("HAZOP") study and Quantitative Risk Assessment ("QRA").

65.     Also, on April 26, 2017, Mr. Veit represented in an email sent to Zeppelin employees and copied to Pyrolyx employee, Holger Merz, that Zeppelin would be responsible for completing the entire Project with the exception of civil site work and ovens (which Pyrolyx would contract for directly).

66.     On May 19, 2017, Christian Tittensor of Zeppelin USA sent an email to Mr. Redd and Mr. Rettenmair, among others, where he represented that Zeppelin would coordinate the project as a whole, undertake overall project scheduling, oversite, coordination and regular reporting, and supply chain management.

67.     Relying upon the above representations, Pyrolyx proceeded with the Project.

68.     However, unbeknownst to Pyrolyx, Zeppelin had misrepresented its resources, manpower, experience, capabilities and intentions to Pyrolyx, as well as to Pyrolyx's advisors who would assist with raising the necessary capital for the Project.

69.     Zeppelin had no intentions to complete the Project for its so-called fixed price.

70.     Zeppelin did not have the resources, manpower, experience and capabilities to complete the Project for the fixed price and within the timeframe or to coordinate the Project as a whole.

71.     Zeppelin had not performed extensive engineering sufficient to understand the various functions of the equipment for the Stegelitz plant and it had never designed, engineered or coordinated as a whole a project like the Terre Haute Project.

12

72.    Zeppelin knew or should have known its so-called fixed price was unrealistically low and the Project could not be completed in accordance with the price and schedule it had provided.

73.    Zeppelin had intentionally understated the cost of constructing the facility with the capacity requested by Pyrolyx so that Pyrolyx would proceed with the Project and then Zeppelin could obtain additional compensation from Pyrolyx.

74.    Zeppelin made its statements in order to induce Pyrolyx to purchase goods and services from it.

75.    Pyrolyx justifiably relied upon Zeppelin's representations.

76.    Had Pyrolyx known that Zeppelin's representations were false, Pyrolyx would have never proceeded with the Project.

77.    Relying upon Zeppelin's representations, Pyrolyx invested significant sums into the Project.

78.    Relying upon Zeppelin's representations, Pyrolyx proceeded with an Australian IPO to raise the capital needed for the Project which involved among other things, issuing an IPO Prospectus incorporating Zeppelin's representations.

79.    Among other things, the IPO Prospectus stated that Zeppelin would design and construct the Project for a fixed price and the fixed-price provided and agreed to by Zeppelin was reasonable and compared favorably to industry experience.

80.    The IPO Prospectus also stated "Zeppelin is an experienced and qualified Contractor for this scope of supply, it is familiar with the technology, and has previously demonstrated the experience and capabilities necessary to successfully perform its obligations under the [agreement for the Project.]"

13

81.    Zeppelin was aware of the representations made about its capabilities in the IPO Prospectus.

82.    At all times Zeppelin was aware that Pyrolyx, its potential investors and advisors would not have financed the Project unless Zeppelin had represented that it had the experience and capabilities to design and build the Project and coordinate the Project as a whole, at the fixed price.

**B.    Zeppelin Agrees to Engineer the Project and Coordinate the Construction of the Project as a Whole and Timely Complete the Project for a Fixed Lump Sum Price.**

83.    In or around June 15, 2017, Pyrolyx Indiana entered into "Contract No. 170124.00 for Carbon Black Recovery System" (the "Contract;" Attached hereto as Exhibit 1) with Zeppelin USA.

84.    In the Contract, Zeppelin USA agreed to supply the engineering services for the Project, including basic and detailed engineering, installation drawings, pipe specifications, master drawings, lists and instructions for components.  Exhibit 1, Contract, Appendix 2, § 4.4.

85.    Zeppelin USA agreed to supply the goods and services necessary to construct the Project, including among other things the "construction manpower" to "complete the installation" of the Project.   Exhibit 1, Contract, Appendix 2, § 5.1.

86.    Zeppelin USA also agreed to "coordinate the [P]roject as a whole:"

Zeppelin shall provide Project Management Consultant ("PMC") services in which Zeppelin will provide PMC services to Pyrolyx to assist Pyrolyx in managing its responsibilities with respect to the project, and will further provide PMC services to coordinate the project as a whole.  Zeppelin's PMC role includes overall project scheduling, oversite of contractors, coordination, regular reporting to Pyrolyx, and also includes supply chain management with respect to Pyrolyx's scope of obligations and supply so that all technical and schedule interfaces are defined and managed as part of the project as a whole.  These PMC services involve supervision, management, and consultation, but do not include any deliverables.

Exhibit 1, Contract, Appendix 2, § 4.5.

14

87.     Zeppelin USA agreed to provide all the goods and services needed for the Project for a fixed price.

88.     The Contract's original fixed price was €15,080,000 (Euro) - or $16,838,920.

89.     Zeppelin USA represented that $5,583,221 of this amount was for Zeppelin's "Engineering and Commissioning Services."

90.     The Contract included a milestone payment schedule as Appendix 1 where certain payments to Zeppelin USA would only become due upon Zeppelin achieving that construction milestone.

91.     These milestones were defined in Appendix 5 of the Contract.

92.     For instance 5% of the contract price was due upon Zeppelin USA achieving cold commissioning as defined in Appendix 5, and 5% of the contract price was due upon Zeppelin achieving hot commissioning as defined in Appendix 5.

93.     As the Contract made clear, Zeppelin USA was solely responsible for mechanically installing and commissioning equipment at the Project:

> **4.1     INSTALLATION BY ZEPPELIN**
> The mechanical installation of the Zeppelin scope of supply will be carried out by Zeppelin with staff and material provided by Pyrolyx according Appendix 5 Site Work and Milestones under the supervision of a Zeppelin supervisor.
> ***
> **4.2     COMMISSIONING BY ZEPPELIN**
> The commissioning will be carried out by our staff with the participation from Pyrolyx.

Exhibit 1, Contract, Appendix 2, §§ 4.1, 4.2.

94.     The Contract included and incorporated Zeppelin USA's project schedule where Zeppelin promised it would complete cold commissioning on or before February 4, 2019, and complete hot commissioning on or before by March 8, 2019.

95.    Because the timely completion of the Project was critical to Pyrolyx's operations and Pyrolyx would experience significant damages if Zeppelin USA did not comply with its schedule obligations, in Article 6.3 of the Contract, the parties agreed that Zeppelin USA would pay Pyrolyx liquidated damages if Zeppelin failed to timely complete its work as required by Contract:

> In the event Seller's delivery of the Goods or Services is delayed by the fault of Seller and not as a result of any act or inaction by Buyer, and such delay causes actual damages to Buyer, then Buyer shall be entitled to liquidated damages from Seller payable hereunder. Liquidated damages shall begin to accrue after the passing of five (5) Business Days beyond the agreed delivery or performance date. Liquidated damages shall accrue at a rate of four-tenths of one percent (0.4%) of the price of the portion of the Goods or Services delayed per each full week delayed, up to a maximum of five percent (5%) of the price of the portion of the Goods or Services delayed per the above; provided however, if the delayed Goods or Services delay Buyer's progress on constructing the Facilities, acceptance testing or Buyer's start-up/commissioning of the Facilities, then such liquidated damages shall accrue at a rate of four-tenths of one percent (0.4%) of the total Contract Price per each full week delayed, up to a maximum of five percent (5%) of the total Contract Price. Delays for partial weeks shall accrue liquidated damages on a pro-rata basis. Liquidated damages payable by Seller hereunder, if any, shall be the sole and exclusive remedy available to Buyer in the event of delayed delivery of Goods or performance of Services so caused by Seller.

Exhibit 1, Contract, Article 6.3.

96.    Zeppelin USA further agreed that any and all changes to the scope of work could be accomplished only by a change order "mutually agreed by [Zeppelin] and [Pyrolyx] in writing" (Exhibit 1, Contract, Article 9.1) and any changes to the Contract "shall be made in writing and executed by both Parties in the same manner as this Contract." Exhibit 1, Contract, Article 19.4.

97.    In the event a party defaulted under the contract, the Contract provided the non-defaulting party the options to take one or more of the following actions:

> (a) terminate the Contract by giving the defaulting Party written notice; (b) take control of the work at the Facility; (c) recover from the defaulting Party immediately on a date specified by the non-defaulting Party, as damages for loss of bargain and not as a penalty, in the case of the Seller's default, an amount equal to

> the cost of completing the work minus the unpaid portion of the Contract Price ….
> (d) cure the default at the defaulting Party's expense; and/or (e) recover from the
> defaulting Party any other damages permissible under this Contract.

Exhibit 1, Contract, Article 17.1.

98.    The Contract provided that in the event a dispute arose between the Parties, the Parties had to "meet at mutually agreed time(s) and location(s) to resolve in good faith any claim or dispute, after a Party's written request."  Exhibit 1, Contract, Article 18.3.

99.    Only "[i]f the matter is not resolved within sixty (60) days after that request" could the Parties "then pursue all available remedies in law or equity and as permissible under this Contract."  Id.

100.    Finally, Zeppelin USA promised Pyrolyx that it would provide goods that were "of high quality and are manufactured in conformity with the best commercial practices" and free of defects.  Exhibit 1, Contract, Article 8.1.

101.    Zeppelin USA also promised Pyrolyx that it would perform its obligations using "trained personnel using proper equipment and instrumentation for the particular Service provided."  Id.

102.    Zeppelin USA also warranted that "the Goods and Services will be provided in accordance with the Specifications for Good[s] and Services set forth in the Appendices attached hereto."  Id.

103.    Moreover, Zeppelin USA promised that the Goods it sold to Pyrolyx "have been designed and manufactured in accordance with accepted industry procedures and practices for similar equipment in similar operating environments."  Exhibit 1, Contract, Article 11.1.

**C.    Zeppelin Ignores its Contractual Obligations, Fails to Complete its Scope of Work and Renders Untimely and Defective Work Under the Contract.**

104.    Pyrolyx issued a notice to proceed to Zeppelin on August 21, 2017.

105.    Notably, at the first Project meeting attended by representatives of Zeppelin Germany, Zeppelin USA, Pyrolyx, E3, the civil site work contractor and ovens supplier, it was repeatedly stressed that since Zeppelin was the project management consultant that was coordinating the project as a whole, all parties were required to support Zeppelin and provide requested information to Zeppelin.

106.    Shortly thereafter on or around August 28, 2017, Zeppelin issued a press release entitled "Zeppelin Group starts construction on the world's largest tire recycling plant" where it further represented that it would design and construct the Project.

107.    In the press release, Zeppelin publicly touted that:  "Zeppelin is taking on the planning and execution of the overall plant, which has a value of around $30 million."

108.    The press release included the following quote from Mr. Veit:  "We are delighted to be supporting Pyrolyx in tire production with our expertise as a market leader in the plant engineering sector, as well as planning the entire plant and acting as general contractor."

109.    Knowing that Zeppelin had understated the cost and complexity of the Project and misrepresented its capabilities to Pyrolyx, Zeppelin immediately began attempting to cut corners and recoup its losses under the guise of change orders.

110.    Zeppelin's management of the Project was poor and it failed to progress the work on the Project in accordance with the schedule it had developed and agreed to in the Contract.

111.    The Project schedule—which Zeppelin had developed and agreed to—had to be repeatedly pushed back due to Zeppelin's material breaches of the contract.

112.    Zeppelin attempted to make up for its self-inflicted delays, recover its own losses, and shift responsibility through the guise of change orders.

113.    For instance, the Project schedule required Zeppelin to complete its engineering

and procurement while other contractors performed civil work on the site and built a pre-fabricated building.

114.    Even though the overall progress of site work and the building proceeded in accordance with plan, Zeppelin did not complete its engineering and mobilize to the site in accordance with the schedule.

115.    Zeppelin unilaterally placed its work on hold, from around May 24, 2018 until June 11, 2018.

116.    Upon information and belief, Zeppelin unilaterally imposed the hold in order to force Pyrolyx into agreeing to extend its schedule so it could avoid liability for liquidated damages.

117.    In accordance with this scheme, Zeppelin forced Pyrolyx to execute a change order extending the deadline for cold commissioning to February 8, 2019, and the deadline for hot commissioning to June 19, 2019.

118.    Zeppelin never regained its schedule and it soon became apparent that Zeppelin would not even make these new extended deadlines.

119.    Among other things, although Zeppelin was employing foreign workers in an attempt to minimize its costs, some of these workers lacked appropriate visa documentation and were rejected entry into the country.

120.    Pyrolyx had to bar other Zeppelin contractors from the Project site due to their unsafe work practices.

121.    By August 2018, Zeppelin had fallen even further behind on the Project as the result of its failure to perform under the Contract.

122.    Zeppelin's engineering delays had trickle-down affects upon procurement, detailed engineering, interference checking and construction.

123.    Its design work failed to account for beams in the post-processing areas or x-bracing installed in Pyrolysis Hall.

124.    Its design was unsafe as it had not designed building columns to handle the load of the main floor structure during an earthquake.  Additional bracing had to be installed to resolve this error.  This caused additional delays.

125.    Zeppelin also failed to timely complete selection of a mechanical and electrical installation contractor.

126.    Major steel structure components were delayed due to Zeppelin's engineering delays.

127.    Zeppelin failed to provide the necessary staff at site to handle and install equipment arriving at site.

128.    Rather than devote the necessary manpower to recover its schedule, Zeppelin instead, once again, unilaterally placed its work on hold from around August 28, 2018 until September 12, 2018.

129.    Again, upon information and belief, Zeppelin unilaterally imposed the hold in order to force Pyrolyx into extending its schedule and avoid liability for liquidated damages.

130.    Moreover, despite Zeppelin's representations that it had the institutional knowledge regarding Pyrolyx's technology and the experience and knowhow to complete the Project based upon its prior work at the Stegelitz plant, Zeppelin claimed it needed additional information regarding Pyrolyx's technology, including a so-called functional description.

131.    Additionally, despite Zeppelin's representations that it had the internal specialists to perform HAZOP (and other safety) studies, Zeppelin claimed it needed additional information regarding Pyrolyx's technology to complete HAZOP (and other safety) studies.

132.    Consistent with its prior pattern and practice, Zeppelin forced Pyrolyx to execute a change order that extended the cold commissioning deadline to February 7, 2019, and the hot commissioning deadline to June 28, 2019.

**D.    Zeppelin Causes Damages to Pyrolyx by Making Additional Repeated Misrepresentations.**

133.    In addition to rendering defective and late work, Zeppelin damaged Pyrolyx by making repeated misrepresentations during the course of its work on the Project.

134.    As part of this scheme, Zeppelin attempted to obtain additional compensation from Pyrolyx by submitting numerous change orders to Pyrolyx for increased costs.

135.    Zeppelin falsely represented to Pyrolyx the status of its work on the Project in an attempt to conceal the full scope of its incompetence, convince Pyrolyx to make payments to it, convince Pyrolyx not to take certain steps and/or prevent Pyrolyx from asserting its rights.

136.    For instance, in November 2018, after Zeppelin informed Pyrolyx that it could not achieve the June 28 deadline, Pyrolyx requested Zeppelin to take all actions necessary to overcome its delay including but not limiting to, expediting delivery of delayed materials, increasing labor at the site and work additional shifts, and stationing its senior, decision-making, manager on site.

137.    In a December 14, 2018 letter from Zeppelin's Patrick Bieger and Thomas Schutze to Pyrolyx's David Steele, Zeppelin represented to Pyrolyx that it had increased its working hours, increased its work-force, expedited shipping methods and shortened the holiday/Christmas break of its workers.

138.    These representations were false.

139.    Zeppelin had not and did not take these actions.

140.    During the months that followed, Zeppelin only fell further behind schedule and entirely abdicated its duty to coordinate the Project as a whole.   It barely devoted any resources

to the Project at all.

141.    In December 2018, even though the Project was far behind schedule and even though Zeppelin represented it was shortening the holiday break, Zeppelin still shut down construction for a two-week holiday season break.

142.    Around this time, E3 (which was reporting on the status of the Project on a monthly basis), observed that Zeppelin displayed a "lack of communication."

143.    E3 also concluded that Zeppelin was no longer "fully committed to meeting" its extended deadlines.

144.    After the holiday break, Zeppelin reduced its labor headcount even further.

145.    Although Zeppelin was responsible and charged Pyrolyx for writing the underlying software programs, it never produced a functional software program to operate the plant.

146.    Instead, Zeppelin failed to coordinate and manage its subcontractor that was responsible for programing the control system software and turned over to Pyrolyx software that was written in three different languages and was incomplete in a variety of ways.

147.    Despite requests by Pyrolyx for Zeppelin to provide a recovery plan, Zeppelin never even attempted to come up with a plan to recover its schedule.

148.    Also, despite Pyrolyx's requests, Zeppelin did not provide any updated detailed commissioning plan.

149.    Moreover, although Zeppelin's Guido Veit also served as a member of the Supervisory Board for Pyrolyx Parent during the Project (from April 2018 through March 2019), he never informed the Pyrolyx Board that Zeppelin could not and would not complete the Project in accordance with its schedule and its fixed price.  Mr. Veit never informed the Supervisory Board that Zeppelin did not consider its fixed costs "fixed," or that Zeppelin considered its costs as

estimates, or that Zeppelin did not have the capability to complete the Project on time or for the fixed-cost it agreed to.

150.    Consistent with its scheme, Zeppelin sent Pyrolyx Invoice No. 82801 on or around May 10, 2019, representing that Zeppelin had completed delivery of all remaining equipment to the site and was due the Contract milestone payment for delivery of all equipment to the site.

151.    This was false.  Zeppelin had not completed delivery of all remaining equipment to the site.  Equipment necessary for the operation of the H2S abatement system had not been delivered.  The software written and provided by Zeppelin was not functional.  Zeppelin continued to deliver equipment to the site even after sending its May 10, 2019 invoice.

152.    When Pyrolyx pushed back against the false invoice, Zeppelin informed Pyrolyx it would stop work if the invoice was not paid.

153.    Zeppelin then essentially abandoned the Project.

154.    Despite the fact Zeppelin had not achieved its hot and cold commissioning milestones, it still issued invoices for these milestones.

155.    Zeppelin sent Pyrolyx Invoice No. 82890 on or around June 27, 2019.

156.    Zeppelin sent Pyrolyx Invoice No. 82910 on or around July 9, 2019.

157.    Zeppelin reissued to Pyrolyx Invoice No. 82801 on or around August 5, 2019

158.    Zeppelin represented in these invoices that it had completed delivery of all remaining equipment to the site and completed cold and hot commissioning of the Project.

159.    These invoices were false.  Zeppelin had not completed delivery of all remaining equipment to the site, nor had it completed cold and hot commissioning of the Project.

160.    After Zeppelin's June 28, 2019 deadline came and passed, Zeppelin did not perform any work during July and August 2019 and pulled its site management off the site in August.

23

161.    Zeppelin left two workers on site, one to attempt to fix Zeppelin's deficient programing and another to support work on Zeppelin's unfinished water pipe heat tracing.

162.    Despite Pyrolyx's request for Zeppelin to provide the necessary manpower for its commissioning obligations, Zeppelin failed to provide any workers for pre-commissioning or commissioning services.

163.    Pyrolyx was forced to expend significant resources to try and complete the Project itself.

164.    In response to Pyrolyx's many requests for Zeppelin to provide the necessary manpower for pre-commissioning and commissioning services, Zeppelin represented it would send a single employee.

165.    A single employee to support pre-commissioning and commissioning was woefully insufficient given the Project's size and complexity. Industry practice would require at least 10 full-time workers to complete commissioning, and in light of the fact that Zeppelin was far behind schedule, many more workers.

166.    In any event, this single employee, who was a Zeppelin contractor—not a Zeppelin employee—was unqualified and operated unsafely requiring Pyrolyx to bar the employee from returning to the site.

167.    As such, Pyrolyx was left with no choice but to declare Zeppelin in default under the terms of the Contract on August 18, 2019 and demand Zeppelin remedy its default.

168.    In an August 29, 2019 letter from Zeppelin's Mike Hoech to Pyrolyx's Thomas Redd, Zeppelin conceded that "hot and cold commissioning of the Zeppelin supplied equipment" is still required.

169.    However, in that same letter, Zeppelin represented to Pyrolyx that its mechanical

installation was complete and it had completed the controls system.

170.    As explained above, these representations were false.

**E.    Zeppelin Admits It Had Made Material Misrepresentations and Attempts to Sabotage the Project and Another Pyrolyx Project After it Abandons the Project.**

171.    Zeppelin never remedied its default.

172.    On September 9, 2019, Pyrolyx sent Zeppelin a letter detailing the numerous damages it had suffered as the result of Zeppelin's defective and untimely performance and making clear that cold commissioning or hot commissioning milestones had still not been met.

173.    Rather than attempt to cure its default, Zeppelin instead sent a September 20, 2019 letter where it admitted to Pyrolyx that it had made misrepresentations to Pyrolyx that induced it to proceed with the Project.

174.    For instance, Zeppelin stated that what it had previously represented to Pyrolyx was a fixed-price amounted to "reasonable estimates for the scope of work necessary to fulfill the Project's conceptual design."

175.    Further, Zeppelin admitted that this was always its intention even when negotiating the Contract and speaking to Pyrolyx, its investors and advisors, noting that "[a]t all times relevant to the negotiations for the Contract, Zeppelin provided reasonable estimates for the scope of work . . . we have always provided good faith estimates."

176.    Zeppelin also stated that although it had previously represented it would design and construct the Project and coordinate the Project as a whole, its role was "to provide a limited scope of mechanical equipment, materials, and installation in coordination with the design criteria set by Pyrolyx."

177.    In the letter, Zeppelin also admitted that it was not entitled to payment for the cold and hot commissioning milestones, as they "are not yet ripe."

178.    In the letter, Zeppelin also requested a meeting to resolve the parties' dispute which it recognized was "a mandatory condition precedent to any litigation" between the parties.

179.    Only *four days* later on September 24, 2019, Zeppelin USA filed a lien against Pyrolyx Indiana and the Project in the amount of $3,549,401.51.

180.    This breached the Contract as Zeppelin did not attempt to resolve the dispute "within sixty (60) days after" its September 20, 2019 written request before it pursued its legal remedy of filing a lien.

181.    Zeppelin filed the lien without following the Contract's dispute resolution process to sabotage Pyrolyx's attempts to obtain funding to complete the Project or proceed with another black carbon project on the site of and adjacent to the Project.

182.    Then, on October 23, 2019, Zeppelin sent another letter, demanding additional amounts for work not completed, and admitting that the promises it had made to Pyrolyx (and repeated in its own press release) that it would be the general contractor responsible for designing and constructing the Project and coordinating the Project as a whole were false.

183.    Contrary to its representations to Pyrolyx, Zeppelin now stated that it was merely a "subcontractor," while Pyrolyx was the "general contractor" and "the sole party contractually responsible for building this Project."  Zeppelin stated it was not responsible for anything more than a "limited scope of equipment installation."

184.    Zeppelin also sent two invoices with its October 23, 2019 letter - Invoice No. 83109 and Invoice No. 83095.

185.    Zeppelin represented in these invoices that it had delivered all parts to the site and completed hot and cold commissioning of the Project.

186.    These invoices were false.  Zeppelin had not delivered all parts to the site and had

not completed hot and cold commissioning of the Project.

187.    On November 19, 2019, Zeppelin USA supplemented the amount of its lien to $5,585,385.70.

188.    Upon information and belief, Zeppelin's increased amount includes payment for spare parts which were never delivered to Pyrolyx and for the cold commissioning and hot commissioning which Zeppelin never completed and which it had admitted were not ripe.

189.    Also, around the time Zeppelin was improperly burdening the Project with liens, it also commenced a campaign to interfere with the Project by impeding Pyrolyx's attempts to finish Zeppelin's work and complete and commission the Project and sabotage this Project and the New Project, which was another carbon black facility in Terre Haute.

190.    Because Zeppelin abandoned the Project, Pyrolyx was forced to take over all the remaining cold commissioning tasks and to perform hot commissioning with no support from Zeppelin.

191.    Pyrolyx was forced to hire other contractors to complete Zeppelin's scope of work at the Project - some of which were Zeppelin's subcontractors that Pyrolyx was forced to contract or work with directly due to Zeppelin's abandoning the Project.

192.    Pyrolyx had a business relationship with other contractors as it had worked with them on either the Project or its Stegelitz project.

193.    Pyrolyx and these contractors have had to correct Zeppelin's defective work and complete unfinished tasks at the Project—all of which are required for commissioning the Project.

194.    Also, Pyrolyx sought to have these contractors perform work or supply equipment for Pyrolyx's New Project on the same site.

195.    Zeppelin was aware of Pyrolyx's contracts and business relationships from its work

on the Project and its work with Pyrolyx at the Stegelitz project.

196.    Zeppelin has attempted to shut down the Project and the New Project on the same site by threatening Pyrolyx's contractors, vendors and those with which Pyrolyx has business relationships, known to Zeppelin (that would have to finish the Project with Pyrolyx and/or work on the New Project) to not do business with Pyrolyx.

197.    Zeppelin has blocked contractors or vendors from providing warranty services to Pyrolyx.

198.    Zeppelin has sent threatening letters to Pyrolyx's contractors, vendors and those with which Pyrolyx has business relationships, known to Zeppelin, alleging among other things that the contractors are breaching their contracts with Zeppelin by improperly utilizing Zeppelin's intellectual property and/or confidential information and requesting they cease and desist such activities (i.e., working with Pyrolyx).

199.    Zeppelin has also threatened Pyrolyx's contractors, vendors and those with which Pyrolyx has business relationships, known to Zeppelin, by telling them they that if they worked with Pyrolyx they would be subject to litigation from Zeppelin for infringing upon Zeppelin's intellectual property rights.

200.    Zeppelin made clear that if the contractors, vendors and those with which Pyrolyx has business relationships, known to Zeppelin, provided equipment or services to Pyrolyx, Zeppelin would not work with them in the future at other sites.

201.    Zeppelin has also sent so-called Cease and Desist Letters to Pyrolyx demanding Pyrolyx stop using Zeppelin's intellectual property and/or confidential information and demand its contractors and vendors do the same.

202.    These letters have no basis and Zeppelin knows the claims in these letters are not

true.

203.    These letters were merely sent to try to sabotage Pyrolyx's attempts to complete the Project and start the New Project.

204.    These letters have been sent to among other companies, Thompson Construction Group, Inc., Zachry Engineering, Sycamore Engineering, Inc., Freemont Industries, LLC, and Mars Mineral.

205.    Also, Zeppelin's other threats of infringement and/or litigation have no basis and Zeppelin knows these claims are not true.

206.    Zeppelin merely made these threats to try to sabotage Pyrolyx's attempts to complete the Project and start the New Project.

207.    For example, Pyrolyx had a business relationship, known to Zeppelin, with a company called dB Technologies where dB would supply Pyrolyx with certain equipment and/or services necessary for its carbon black plants.

208.    As the result of Zeppelin's interference and threats, dB will no longer work with Pyrolyx.

209.    The above referenced conduct of Zeppelin has damaged Pyrolyx as it has been unable to obtain equipment and/or services it needs for the Project and/or the New Project.

210.    Also, Pyrolyx had business relationships, known to Zeppelin, with companies called R. Stahl, NERAK, Donaldson, and SMART Controls.    As the result of Zeppelin's interference and threats, none of these companies will work with Pyrolyx.

211.    Upon information and belief, Zeppelin is attempting to delay or prevent commissioning of the Project and Pyrolyx's attempts to build the New Project in order to leverage Pyrolyx into making additional unwarranted payments to Zeppelin.

212.    Such interference has delayed completion of the Project.

213.    Such interference has prevented and delayed Pyrolyx from starting the New Project.

214.    Such interference has hindered Pyrolyx's ability to obtain funding and lender approval for the New Project, and severely increased labor and material costs as many contractors have refused to work on the New Project as the result of Zeppelin's improper interference.

215.    Pyrolyx has demanded Zeppelin cease such interference with its business but Zeppelin has refused.

## COUNT I

### BREACH OF CONTRACT
### *Pyrolyx Indiana v. Zeppelin USA*

216.    Pyrolyx restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

217.    Pyrolyx Indiana and Zeppelin USA entered into a valid contract, pursuant to which Pyrolyx Indiana agreed to pay Zeppelin USA a fixed amount as consideration for Zeppelin USA providing the timely and complete engineering, procurement, equipment installation and coordination of the Project as a whole.

218.    Pyrolyx Indiana has performed all material obligations under the Contract.

219.    Zeppelin USA has materially breached its obligations under the Contract by, *inter alia*, failing to progress the Project in a timely manner, failing to prosecute its work with sufficient promptness and diligence; failing to complete its scope of work under the Contract; violating common industry practices; failing to supply adequate staffing of properly skilled workers; failing to provide work that is of high quality and in conformity with the best commercial practices and free of defects; failing to provide work in a good and workmanlike manner that is free from defective

workmanship, materials and equipment; and failing to follow the Contract's mandatory dispute resolution procedure.

220.    As a direct and proximate cause of Zeppelin USA's breaches, Pyrolyx Indiana has suffered significant damages and is entitled to all such damages under the Contract, including compensatory damages, costs of completing the Project, costs of repairing defective work, liquidated damages and all special and consequential damages, including but not limited to lost profits.

**WHEREFORE,** Pyrolyx USA Indiana, LLC requests the Court enter judgment in its favor and against Zeppelin Systems USA, Inc. for all damages allowed by law, plus interest, costs, and expenses, and such other relief as this Court deems appropriate.

## COUNT II

### FRAUDULENT INDUCEMENT/FRAUD
### *Pyrolyx Indiana, Pyrolyx USA & Pyrolyx Parent v. Zeppelin USA & Zeppelin Germany*

221.    Pyrolyx restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

222.    As set forth in further detail herein, Zeppelin USA and Zeppelin Germany made false statements and material misrepresentations of existing facts when they stated that they had the capability to timely complete the Project for a fixed price.

223.    As set forth in further detail herein, Zeppelin USA and Zeppelin Germany made false statements and material misrepresentations of existing facts when they stated that they would timely complete the Project for a fixed price.

224.    As set forth in further detail herein, Zeppelin USA and Zeppelin Germany made false statements and material misrepresentations of existing facts, falsely representing to Pyrolyx the status of the work on the Project in an attempt to conceal the full scope of their incompetence,

convince Pyrolyx to make payments, convince Pyrolyx not to take certain steps and/or prevent Pyrolyx from asserting its rights.

225.    Zeppelin USA and Zeppelin Germany's false statements were fundamentally material to Pyrolyx's decisions to proceed with the Project and enter the Contract.

226.    Also, Zeppelin USA and Zeppelin Germany's false statements were fundamentally material to Pyrolyx's decisions to make payments, convince Pyrolyx not to take certain steps and/or prevent Pyrolyx from asserting its rights.

227.    Zeppelin USA and Zeppelin Germany made these statements with knowledge of their falsity and/or with utter disregard and recklessness ignorance of their falsity.

228.    Zeppelin USA and Zeppelin Germany made these representations with the intent to deceive Pyrolyx into relying upon them, to proceed with the Project and enter the Contract, make payments and or not take certain steps and/or prevent Pyrolyx from asserting its rights.

229.    Pyrolyx justifiably relied upon Zeppelin USA and Zeppelin Germany's representations, in reliance thereon proceeded with the Project and entered into the Contract, all to Pyrolyx's detriment.

230.    Zeppelin USA and Zeppelin Germany intentionally, willfully, recklessly and maliciously made false statements to Pyrolyx.

231.    Zeppelin USA and Zeppelin Germany's misrepresentations and Pyrolyx's justifiable reliance proximately caused Pyrolyx to suffer significant harm and damage to its business and property, and Pyrolyx is entitled to all such damages and punitive damages.

**WHEREFORE,** Pyrolyx USA Indiana, LLC, Pyrolyx USA, Inc. and Pyrolyx AG request the Court enter judgment in their favor and against Zeppelin Systems GmbH and Zeppelin Systems

USA, Inc. for all damages allowed by law, plus interest, punitive damages, attorneys' fees, costs, and expenses, and such other relief as this Court deems appropriate.

## COUNT III

### CONSTRUCTIVE FRAUD
### *Pyrolyx Indiana, Pyrolyx USA & Pyrolyx Parent v. Zeppelin USA & Zeppelin Germany*

232.    Pyrolyx restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

233.    As set forth in further detail herein, Zeppelin USA and Zeppelin Germany owed a duty to Pyrolyx due to their relationship of trust and confidence.

234.    As set forth in further detail herein, Zeppelin USA and Zeppelin Germany violated that duty by making deceptive material representations of past or existing facts or remaining silent when they had a duty to speak.

235.    Pyrolyx justifiably relied upon Zeppelin USA and Zeppelin Germany's representations, in reliance thereon proceeded with the Project and entered into the Contract, and decided to purchase goods and services from Zeppelin.

236.    As a proximate result of Zeppelin USA and Zeppelin Germany's deceptive material representations or failure to speak, Pyrolyx has been injured.

237.    As a result of Zeppelin USA and Zeppelin Germany's deceptive representations or failure to speak, Zeppelin USA and Zeppelin Germany have gained an advantaged at the expense of Pyrolyx.

**WHEREFORE,** Pyrolyx USA Indiana, LLC, Pyrolyx USA, Inc. and Pyrolyx AG request the Court enter judgment in their favor and against Zeppelin Systems GmbH and Zeppelin Systems

USA, Inc. for all damages allowed by law, plus interest, punitive damages, attorneys' fees, costs, and expenses, and such other relief as this Court deems appropriate.

## COUNT IV

### TORTIOUS INTERFERENCE WITH CONTRACT/BUSINESS RELATIONS
### *Pyrolyx Indiana, Pyrolyx USA & Pyrolyx Parent v. Zeppelin USA & Zeppelin Germany*

238.    Pyrolyx restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

239.    Pyrolyx has valid and enforceable contracts and/or business relationships with numerous contractors and vendors to complete the Project and to complete another Terre Haute project, including among other companies, Thompson Construction Group, Inc., Sycamore Engineering, Inc., Freemont Industries, LLC, Mars Minerals, dB Technologies.

240.    Zeppelin is aware, and at all times relevant to this Complaint was aware of the existence of these contracts and business relationships.

241.    Zeppelin has threatened these and other contractors and vendors by telling them they that if they worked with Pyrolyx they would be subject to litigation from Zeppelin for infringing upon Zeppelin's intellectual property rights and/or Zeppelin would not work with them in the future at other sites.

242.    Zeppelin has also sent threatening letters to these and other contractors and vendors, alleging among other things that the contractors are breaching their contracts with Zeppelin by improperly utilizing Zeppelin's intellectual property and/or confidential information and requesting they cease and desist such activities and not work with Pyrolyx.

243.    These letters have no basis.

244.    Zeppelin knows the claims in these letters are not true.  Further, Zeppelin was aware

at all times of the damage these letters would have on Pyrolyx's business and was promptly advised of such potential damage when Pyrolyx became aware of these letters.

245.    Zeppelin willfully and intentionally interfered with those contracts and business relationships for its financial gain, as set forth above

246.    Zeppelin took direct actions to interfere with these business relationships and played an active part in persuading numerous contractors and vendors to breach their contracts and/or not perform, as set forth above.

247.    Zeppelin's acts were not justified.

248.    Zeppelin's acts were taken exclusively to harm Pyrolyx's business interests.

249.    Zeppelin's acts were not taken in the normal interests of its business.

250.    Zeppelin's actions have damaged and threaten to continue to damage Pyrolyx.

251.    Zeppelin acted maliciously, outrageously, with reckless indifference to the consequences of their actions and without privilege.

**WHEREFORE,** Pyrolyx USA Indiana, LLC, Pyrolyx USA Inc. and Pyrolyx AG request the Court enter judgment in their favor and against Zeppelin Systems GmbH and Zeppelin Systems USA, Inc. for all damages allowed by law, for all damages allowed by law, plus interest, punitive damages, attorneys' fees, costs, and expenses, and such other relief as this Court deems appropriate.

<u>**COUNT V**</u>

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
***Pyrolyx Indiana, Pyrolyx USA & Pyrolyx Parent v. Zeppelin USA & Zeppelin Germany***

252.    Pyrolyx restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

253.    Pyrolyx had business relationships with numerous contractors and vendors to complete the Project and to complete another Terre Haute project.

254.    Zeppelin is aware, and at all times relevant to this Complaint was aware of the existence of these business relationships.

255.    Zeppelin has intentionally interfered with these relationships by among other things, contacting these contractors and vendors orally and in writing, threatening them by telling them they that if they worked with Pyrolyx they would be subject to litigation from Zeppelin for infringing upon Zeppelin's intellectual property rights and/or Zeppelin would not work with them in the future at other sites

256.    These threats have no basis.

257.    Zeppelin knows the threats are not true.  Further, Zeppelin was aware at all times of the damage these threats would have on Pyrolyx's business and was promptly advised of such potential damage when Pyrolyx became aware of these threats.

258.    Zeppelin willfully and intentionally interfered with those contracts and business relationships for its financial gain, as set forth above

259.    Zeppelin took direct actions to interfere with these business relationships and played an active part in persuading numerous contractors and vendors to not work with Pyrolyx, as set forth above.

260.    Zeppelin's acts were not justified.

261.    Zeppelin's acts were taken exclusively to harm Pyrolyx's business interests.

262.    Zeppelin's acts were not taken in the normal interests of its business.

263.    Zeppelin's actions have damaged and threaten to continue to damage Pyrolyx.

264.    Zeppelin acted maliciously, outrageously, with reckless indifference to the consequences of their actions and without privilege.

**WHEREFORE,** Pyrolyx USA Indiana, LLC, Pyrolyx USA Inc. and Pyrolyx AG request the Court enter judgment in their favor and against Zeppelin Systems GmbH and Zeppelin Systems USA, Inc. for all damages allowed by law, for all damages allowed by law, plus interest, punitive damages, attorneys' fees, costs, and expenses, and such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pyrolyx hereby demands a trial by jury on all claims and issues.

Date:  April 16, 2020                        */s/  Jeffry A.  Lind*
                                            Jeffry A. Lind, Atty No. 14290-06

                                            Lind Law Firm
                                            400 Ohio Street
                                            Terre Haute, IN 47807
                                            Telephone:  (812) 234-5463
                                            jlind@lindlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, attorney for Plaintiffs, hereby certified that a copy of the foregoing Amended Complaint was filed electronically on April 16, 2020. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

William W. Drummy
wwdrummy@wilkinsonlaw.com

Holly A. Reedy
hareedy@wilkinsonlaw.com

_/s/  Jeffry A. Lind_____
Jeffry A. Lind, Atty No. 14290-06